UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                     Case No.: 8:20-cr-138-T-36JSS

LUIS ELIAS ANGULO LEONES,
JHONIS ALEXIS LANDAZURI
ARBOLEDA, and
DILSON DANIEL ARBOLEDA
QUINONES
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Defendant Dilson Daniel Arboleda Quinones's ("Defendant Quinones") Motion to Suppress Statements ("Motion to Suppress") (Dkt. 53), the Government's response in opposition to the Motion to Suppress (Dkt. 67), and Defendant Quinones's Notice of Recent Eleventh Circuit Authority (Dkt. 137).   The Motion to Suppress was referred to the undersigned for a report and recommendation.   (Dkt. 60.)   On October 13, 14, and 15, 2020, the undersigned held an evidentiary hearing on the Motion to Suppress.   For the reasons that follow, the undersigned recommends that the Court deny the Motion to Suppress.

## BACKGROUND

A March 19, 2020 indictment alleges that Luis Elias Angulo Leones, Jhonis Alexis Landazuri Arboleda, and Defendant Quinones (collectively, "Defendants"), "while upon the high seas on board a vessel subject to the jurisdiction of the United States," conspired to knowingly and intentionally distribute and possess with the intent

to distribute (Count I), and aided and abetted one another in possessing with intent to distribute   (Count II), "five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine," in violation of 21 U.S.C. § 960(b)(1)(B)(ii), 46 U.S.C. §§ 70503(a), 70506(a), (b), and 18 U.S.C. § 2.  (Dkt. 1.)

Defendant Quinones timely filed the Motion to Suppress on June 15, 2020. Thereafter, the Court noticed an evidentiary hearing on the Motion to Suppress.  (Dkt. 69.)  Upon Defendants' motion and consent by the parties, the Court continued the hearing due to issues associated with the coronavirus pandemic, difficulties with video conferencing technology at the Pinellas County Jail, availability of witnesses, and the parties' preference for an in-person evidentiary hearing.  (Dkts. 74, 75.)  On October 13, 14, and 15, 2020, the Court conducted an in-person evidentiary hearing on the Motion to Suppress.[1]  (Dkts. 113, 114, 115.)  Defendant Quinones and all witnesses appeared in-person before the Court.

During the hearing, Defendant Quinones sought to expand the issues raised in the Motion to Suppress beyond those contained in his moving papers.  The Court denied this request and limited the issues for consideration to those properly and timely raised before the Court.[2]  Defendant Quinones later raised these issues in a subsequent motion (Dkt. 134), which the Court will address separately.

---

[1] The Court simultaneously conducted an evidentiary hearing on Defendants' Motions to Dismiss (Dkts. 48, 54) and heard oral arguments on Defendant Angulo Leones's Motion for Bill of Particulars (Dkt. 44), adopted by all Defendants (Dkt. 77).  The Court addressed these motions separately.  (Dkts. 144, 143, respectively.)

[2] *See, e.g., Ocasio v. C.R. Bard, Inc.*, No. 8:13-cv-1962-T-36AEP, 2020 WL 3288026, at *2 n.1 (M.D. Fla. June 18, 2020) (declining to consider new arguments raised for the first time at oral argument); *Starbuck v. R J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1229 (M.D. Fla. 2018) (noting that an

# FACTUAL FINDINGS

At the evidentiary hearing on the Motion to Suppress, the Court heard the testimony of United States Coast Guard Chief Boatswain's Mate Jeremy Swearer ("Chief Swearer"), United States Coast Guard Maritime Enforcement Specialist Luis Saenz ("Officer Saenz"), United States Coast Guard Lieutenant Kyle Pearson ("Lieutenant Pearson"), United States Drug Enforcement Administration Special Agent Jose Ramirez ("Agent Ramirez"), United States Federal Bureau of Investigation Special Agent Luis C. Lima ("Agent Lima"), and Defendant Quinones. Additionally, the Court received into evidence without objection the Government's exhibits, which included a map showing the approximate location of the vessel's interdiction (Gov't Ex. 1), a detainee log maintained by the United States Coast Guard ("Coast Guard") during Defendants' detention (Gov't Ex. 2A), a medical history log maintained by the Coast Guard during Defendants' detention (Gov't Ex. 2B), documents allegedly signed by Defendant Quinones (Gov't Ex. 3), the Alpha Report prepared by the Coast Guard during the interdiction (Gov't Ex. 4A), and the Victor Report prepared by the Coast Guard during the interdiction (Gov't Ex. 4B).  (Dkt. 121.)

The Court also received into evidence without objection five of Defendant Quinones's exhibits, which included an activity log from the United States Coast

---

argument not appearing in the proponent's briefing was not properly before the Court); *Rivas v. Berryhill*, No. 16-cv-61861, 2018 WL 328796, at *4 (S.D. Fla. Jan. 9, 2018) (explaining that courts have discretion to decline to consider new arguments raised for the first time at oral argument).

Guard Cutter *Mohawk* (Def. Ex. 9), a Requisition and Invoice/ Shipping Document (Def. Ex. 13), photographs of Defendants and their personal belongings (Def. Ex. 15), a Drug Enforcement Administration Report of Investigation (Def. Ex. 17), and a consulate request form (Def. Ex. 19). (Dkt. 120.) Further, the Court received one of Defendant Quinones's exhibits into evidence over the Government's objection—a piece of material characterized as similar to Tyvek (Def. Ex. 18). Based on the testimony and the exhibits entered into evidence, the undersigned recommends the following findings of fact.

On March 10, 2020, a maritime patrol aircraft observed a small "go fast vessel" ("GFV") in international waters of the Eastern Pacific Ocean, approximately 87 nautical miles south of Jicarita Island, Panama. At approximately 11:30 p.m. Zulu Time,[3] the Coast Guard Cutter *Mohawk* ("*Mohawk*"), on patrol in the area, launched a small over-the-horizon boat, HAWK 1, to intercept the vessel. Coast Guard officers aboard HAWK 1 (the "Boarding Team") hailed the vessel and conducted right of approach questioning under international law.[4] The Boarding Team was comprised of the following Coast Guard personnel: Chief Swearer, Officer Saenz, Boatswain's

---

[3] Coast Guard personnel testified that, while at sea, they use an international unit of time called "Zulu Time." Zulu Time is denoted with a "Z" after the hourly time in Coast Guard documents. Coast Guard personnel testified that during this interdiction, local time was approximately five hours behind Zulu Time. Because the evidence and testimony received by the Court refer to Zulu Time, all times in this report and recommendation also refer to Zulu Time.

[4] "The 'right of approach' is a doctrine of international maritime common law that bestows a nation's warship with the authority to hail and board an unidentified vessel to ascertain its nationality." *United States v. Romero-Galue*, 757 F.2d 1147, 1149 n.3 (11th Cir. 1985). "The 'right of approach' is codified by article 22 of the Convention on the High Seas." *Id.* (citing Convention on the High Seas art. 22, *opened for signature* Apr. 19, 1958, 13 U.S.T. 2312).

Mate First Class Seth Pontecorvo, Boatswain's Mate Second Class Harry T. Seibert, and Machinery Technician Petty Officer Third Class Don A. Castellon.

HAWK 1 maneuvered alongside the subject vessel, named *Divino Nino Jesus*. Chief Swearer then asked the crew members a series of questions through the Boarding Team's translator, Officer Saenz.[5]   Officer Saenz is a native Spanish speaker and translator certified by the Department of Defense.  After this initial questioning, Chief Swearer relayed the collected information back to the *Mohawk* and awaited further instructions.  Coast Guard personnel aboard the *Mohawk* then relayed the information to "District 11," the command center located in California overseeing Coast Guard operations in the Eastern Pacific Ocean.

In the interim, Officer Saenz became aware that the crew aboard the target vessel had not eaten any food in recent days, as they lacked food on their vessel. Officer Saenz offered each crew member tuna that he had packed for himself.  At approximately 4:30 a.m. on March 11, 2020, personnel aboard the *Mohawk* advised Chief Swearer that District 11 granted the Boarding Team permission to board the target vessel as a vessel without a nationality pursuant to the Maritime Drug Law Enforcement Act ("MDLEA").  *See* 46 U.S.C. §§ 70501–70508.

The Boarding Team boarded the vessel and, pursuant to authorizations from District 11, conducted intrusive searches of the boat.  During the search, the Boarding

---

[5] The Boarding Team asked the crew members questions to determine the nationality of the vessel and crew as well as the identity of the master or person in charge of the vessel.  This issue is fully discussed separately in Court's Report and Recommendation on Defendants' Motions to Dismiss (Dkt. 144).

Team drilled holes into the deck and found cocaine. District 11 then granted the Boarding Team permission to treat the crew members as detainees. The Boarding Team collected the crew member's personal belongings, placed the items in evidence bags, and transferred Defendants and their belongings back to the *Mohawk*. The personal belongings collected included identification cards, personal hygiene products, money, and medications.

In accordance with the Coast Guard's standard procedures, Defendants were provided Tyvek suits and open sandals to wear. Their personal clothing was included with the evidence collected from the vessel. They were also provided two blankets. Defendants were housed outside on the top deck of the *Mohawk*, under a self-supporting all-weather tent secured to the deck. The tent had three sides, with one side left open to enable Coast Guard personnel to observe the detainees at all times. Within the tent, Defendants slept on plastic platform cots, raised approximately six inches above the ground. Although the tent provided overhead cover, water from the deck would occasionally flow into the tent due to movement of the cutter at sea. At times, the Tyvek suits would become soiled or damaged and Defendants were provided a new suit. Defendants were not permitted to wear undergarments beneath the suits.

Defendants were held under the observation of rotating shifts of two Coast Guard crew members, referred to as watch standers. The watch standers maintained a log of Defendants' activity, which included notations for restroom use, showers, food, requests made by Defendants for personal or medical care, the provision of

- 6 -

additional supplies, and the provision of entertainment or comfort items[6] (the "Detainee Log").  The Detainee Log referred to each Defendant separately.  In the log, "D02" or "Detainee 02" denotes all activity concerning Defendant Quinones. Each Defendant was secured using a shackle on one ankle.  The ankle shackle was attached to a twenty-foot chain running the length of the detainee area.  Defendants could ask to switch the ankle shackle if irritation or discomfort occurred at the contact point.  Defendants were restrained by the shackles at all times during their detention, except when showering, using the restroom, or during supervised breaks at the discretion of the watch standers.

     After eighteen days aboard the *Mohawk*, Defendants were transferred to the Coast Guard Cutter *Hamilton* ("*Hamilton*") on March 29, 2020.  The *Hamilton* was returning from duty earlier than the *Mohawk*.  Defendants were held on the *Hamilton* for approximately five days until their arrival in Port Everglades, Florida, on April 3, 2020.

     During their time in Coast Guard custody, Defendants were provided access to a restroom upon request and regular showers.  They were routinely seen by the medical crew member aboard the cutter, "HS1," each day.  HS1 was not a medical doctor but could administer some medications and provide other medical care.  Defendants were provided three meals each day, which consisted of the same meals given to the cutter's

---

[6] Specifically, the Detainee Log reflects that watch standers aboard the *Mohawk* provided entertainment to Defendants by playing music on approximately six occasions, offered them playing cards, and played the movie *Dracula*.  Aboard the *Hamilton*, Defendants were offered playing cards and dominos on two occasions.

crew.  Additionally, Defendants had access to water, and they could request ice or, at times, Gatorade as well.[7]

Shortly after his detention aboard the *Mohawk*, Defendant Quinones was provided hydrocortisone cream for skin irritations, ibuprofen for pain, and senna tabs for constipation.  On March 13, 2020, Defendant Quinones's eyes began to swell and he was having trouble breathing.  The medical staff administered a shot of diphenhydramine after Defendant Quinones informed the staff that he was allergic to some medications but could not recall what kind.  The following day, he was provided additional diphenhydramine.  Thereafter, his symptoms from the reaction abated.  After this incident, Defendant Quinones frequently reported "no concerns" to the medical staff.  He was provided more hydrocortisone cream and soluble fiber when needed.  Defendant Quinones also reported "no complaints" to the medical staff each day aboard the *Hamilton*.  Defendant Quinones testified that the medical staff did not provide him with additional medication after his reaction.  He did not testify that he requested and was denied any medication for a specific medical issue.

Defendants had no ability to contact family members, speak with an attorney, or appear before a judge while in Coast Guard custody.  They were neither given *Miranda*[8] warnings nor interrogated.  Officer Saenz testified that at times, he noticed

---

[7] Due to the COVID-19 pandemic, the *Mohawk* could not visit any ports of call while on patrol.  During a resupply event off the coast of Panama, the *Mohawk* had to sit at anchor within twelve miles of shore, which was too close to operate the necessary machinery to purify the water.  As a result, Defendants went approximately one day without access to drinking water.

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

that Defendant Quinones was crying, and that Defendant Quinones was attempting to speak with him.   Officer Saenz stated that he did what he could to listen to Defendant Quinones's complaints, pursuant to Coast Guard policy.   However, Officer Saenz testified that he was not permitted to contact a detainee's family or consulate.

When the *Hamilton* arrived at Port Everglades in Fort Lauderdale, Florida on the morning of April 3, 2020, Agent Ramirez met Defendants on the ship.   He observed that Defendants were dressed in the Tyvek suits and appeared in normal physical condition.   The Coast Guard shackles were removed so Defendants could safely maneuver off the vessel.   Once on land, Agent Ramirez testified that Defendants were placed in leg shackles, handcuffed, and their hands were secured in front of them with a Velcro belly chain.[9]   Afterwards, Defendants were loaded into an air-conditioned van operated by the United States Department of Homeland Security and transported to Pinellas County, Florida.   Agent Ramirez did not accompany Defendants after placing them in the van.

Agent Ramirez and Agent Lima testified that they believed Defendant Quinones was provided food during the drive to Pinellas County.   Further, they understood that the van stopped at least once for a restroom break during the trip. Neither Agent Ramirez nor Agent Lima had personal knowledge of the events of the

---

[9] Agent Ramirez described a "belly chain" as a piece of Velcro wrapped around the waist, which is then attached to the detainee's hands.  The effect of a belly chain, according to Agent Ramirez, is to secure a detainee's hands in front of his or her stomach.  (Dkt. 124 at 167.)

transport.  Defendant Quinones testified that he was not given any food during the trip and that the van did not make any stops prior to arriving in Pinellas County.

Defendants arrived at the Panama Express Strike Force ("PanEx") facility[10] in Pinellas County later that same day.  Upon arrival, PanEx agents escorted Defendants and other detainees from the van into a holding room and provided them with food, water, and access to a restroom.  The detainees in the room, including Defendant Quinones, were then called into separate rooms for questioning.  Defendant Quinones confirmed that he was given a sandwich while he waited.  (Dkt. 125 at 76.)

Defendant Quinones was the last person called in for questioning from the holding room.  At approximately 2:00 p.m., he was taken into a smaller room, measuring approximately ten by fifteen feet, with a steel table bolted to the floor and three chairs.  Agent Lima was in the room, along with Special Agent Dan Kane from Homeland Security Investigations.  Only Agent Lima spoke Spanish, so he conducted the interview of Defendant Quinones.  Although Agent Lima is not a native Spanish speaker, he earned certification in the Spanish language from the Federal Bureau of Investigation.   He  has  conducted  many  interviews  in  Spanish  during  his  law enforcement career.  Agent Lima testified he had no difficulty communicating with Defendant Quinones.  According to Agent Lima, Defendant Quinones's responses to

---

[10] According to Agent Lima, the Panama Express Strike Force is a multiagency drug strike force that investigates counter narcotics.  (Dkt. 124 at 188.)  The strike force utilizes a facility located in Pinellas County, Florida.

Agent Lima's questions indicated that Defendant Quinones could understand and comprehend Agent Lima's Spanish dialect.

When he arrived in the interview room, Agent Lima testified that "nothing stood out about [Defendant Quinones].  He did not complain of any fatigue or anything out of the ordinary." (Dkt. 125 at 23.)  Defendant Quinones did not appear malnourished or in poor health.  Defendant Quinones was polite and calm and did not voice any health concerns.   Agent Lima first introduced himself to Defendant Quinones.   Next, Agent Lima reviewed an administrative form with Defendant Quinones to collect his biographical information.  Subsequently, Agent Lima reviewed a consular notification form with Defendant Quinones.  Agent Lima read the form aloud.  Defendant Quinones indicated his understanding by electing to have the Colombian consulate notified of his detention and signed the form to confirm his election. (Dkt. 124 at 196–97.)

After reviewing the consular notification form, Agent Lima testified he reviewed a recording form with Defendant Quinones.  In the recording form, an interviewee can agree or decline to have his interview recorded.  Agent Lima testified that he explained to Defendant Quinones that he could choose whether to have his interview recorded.  Defendant Quinones chose not to have his interview recorded.  The form was signed by Defendant Quinones, Agent Lima, and Agent Kane.  (Dkt. 124 at 197–98.)

Agent Lima then reviewed an "advice of rights" form with Defendant Quinones.  The advice of rights form includes a recitation of a defendant's *Miranda*

rights.  On cross-examination, Agent Lima stated that he did not have an independent recollection of reviewing the advice of rights form with Defendant Quinones but that he has a standard procedure for every interview.  (Dkt. 125 at 29–30.)  According to Agent Lima, he read and explained each right on the form individually.  Agent Lima testified that he laid the form on the table for Defendant Quinones to follow along as he read the form aloud.  Agent Lima further explained that for each interview, he would read each right, make sure the interviewee understood, and inform the interviewee that they could stop the interview at any time.  (Dkt. 124 at 198–201; Dkt. 125 at 29–30.)  Agent Lima further testified that he would begin the substantive interview only if the interviewee understood the contents of the form and chose to sign the form waiving his *Miranda* rights.  (Dkt. 124 at 194, 198–202.)

During the interview of Defendant Quinones, Agent Lima wrote 2:12 p.m. at the top of the advice of rights form—the time he began discussing the form with Defendant Quinones.  At the bottom of the form, Agent Lima wrote 2:15 p.m.—the time the discussion concerning the form ended.  Agent Lima testified that he believed those timestamps were correct and that the discussion lasted three minutes.  Afterwards, according to Agent Lima, Defendant Quinones willingly signed the form, waived his *Miranda* rights, and consented to the interview.  (Dkt. 124 at 200–01.)  The form was also signed by Agent Lima and Agent Kane.

Defendant Quinones's account of the interview differed from that of Agent Lima.  Defendant Quinones testified that he felt pressured by the experience with Agent Lima.  He also testified that he was frightened after Agent Lima told him about

- 12 -

other young individuals who had received sentences of incarceration of 30 years or more.  (Dkt. 125 at 86.)

Defendant Quinones is a twenty-three-year-old Colombian national with a sixth-grade education.  Prior to the interdiction, he had never been to the United States.  He stated that he had no knowledge of the American court system or the role of an attorney.  He testified that he signed the forms at the direction of Agent Lima, without understanding the nature of what he was doing.  He also testified that he had trouble understanding Agent Lima's Spanish dialect.  When asked why he did not ask any questions about the forms Agent Lima presented to him, he stated that he believed Agent Lima would help him if he cooperated.  (Dkt. 125 at 86.)  He further testified that he signed the forms out of fear that he would be "wasting his life" if sentenced to serve time in prison.  (*Id.*)  Additionally, Defendant Quinones explained that he became concerned about what his codefendants may have shared with investigators.  Because he was the last person to be interviewed, he started wondering whether the agents "already knew everything."  (Dkt. 125 at 89.)

Defendant Quinones could not recall whether Agent Lima advised him that his statements could be used against him.  (Dkt. 125 at 90.)  When asked if he believed he had a choice concerning whether to sign the forms, he unequivocally said "yes."  (Dkt. 125 at 90–91.)  He then explained that he decided to sign the forms because he believed the agents could help him if he cooperated.  (*Id.*)  Defendant Quinones confirmed that he did not provide a substantive statement prior to signing the forms.  (Dkt. 125 at 87.)  For the reasons explained herein, the undersigned finds Defendant Quinones's

testimony regarding the reading and signing of the advice of rights form to be inconsistent and therefore not credible. *See* discussion *infra* at p. 24–27. Further, the undersigned credits the testimony of Agent Lima in this regard.

After Defendant Quinones signed the advice of rights form, Agent Lima questioned him for approximately one hour. Defendant Quinones first made a statement about being kidnapped. Based on his experience, Agent Lima believed this statement to be untrue and he discouraged Defendant Quinones from making a false statement. (Dkt. 125 at 43.) Thereafter, Defendant Quinones made incriminating statements to Agent Lima. Defendant Quinones never asked for a lawyer or sought to stop the interview. Moreover, Defendant Quinones remained calm and polite throughout his discussion with Agent Lima.

At the end of the hour, Agent Lima's supervisor encouraged him to conclude the interview and transfer Defendant Quinones to another van waiting outside.[11] While he was being escorted to the van, Defendant Quinones reminded Agent Lima that he had been promised an opportunity to make a phone call. Agent Lima provided him a cell phone and a few minutes to contact his family. Agent Lima did not condition the promise of a phone call on Defendant Quinones's cooperation or agreement to be interviewed.

---

[11] Thereafter, Defendant appeared in Court for his Fed. R. Crim. P. 5 hearing on Monday, April 6, 2020 (Dkt. 20), after arriving in the Middle District of Florida in the late afternoon on Friday, April 3, 2020 (Dkt. 124 at 189).

## ANALYSIS

In his Motion to Suppress, Defendant Quinones argues that he did not validly waive his *Miranda* rights and that the Court should therefore suppress all of his statements.  Specifically, Defendant Quinones argues he did not voluntarily or knowingly waive his rights due to the length of his detention, treatment during his detention, his age, his limited education, his lack of understanding about the American court system, and Agent Lima's conduct during the interview.[12]  The undersigned finds that under the totality of the circumstances, Defendant Quinones made a voluntary, knowing, and intelligent decision to waive his *Miranda* rights and the Motion to Suppress should be denied.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  A defendant's statements made during a custodial interrogation may not be used against the defendant unless law enforcement employed the proper safeguards to protect the defendant's constitutional right against self-incrimination.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney,

---

[12] In his Motion, Defendant Quinones also argues that Agent Lima denied a request for an attorney during the interview.  Agent Lima testified that Defendant Quinones never made this request.  Agent Lima further testified that if a detainee requests an attorney, the "interview is terminated, if it's during the interview."  If the interview has not yet started when a detainee requests an attorney, the interview "doesn't start."  (Dkt. 125 at 36–37.)  Defendant Quinones did not testify concerning any request for an attorney.  The Court finds Agent Lima's testimony to be credible concerning this issue.

either retained or appointed." *Id.* Statements obtained in violation of this rule will be generally inadmissible in the prosecution's case in chief. *See United States v. Patane*, 542 U.S. 630, 639 (2004).

After a defendant is given *Miranda* warnings, the defendant "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. This requires that the waiver be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (quoting *Moran*, 475 U.S. at 421). Ultimately, a waiver will only be effective if the totality of the circumstances "reveal both an uncoerced choice and the requisite level of comprehension." *Moran*, 475 U.S. at 421. The government bears the burden of demonstrating a defendant's voluntary, knowing, and intelligent waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

## A. Detention

Defendant Quinones contends that the length and conditions of his treatment aboard the *Mohawk* and *Hamilton* were so egregious as to render his confession involuntary. In response, the Government maintains that Defendant Quinones was

treated humanely and respectfully while in Coast Guard custody. As such, according to the Government, the conditions were insufficient to overbear Defendant Quinones's will.

Defendant Quinones's treatment aboard the *Mohawk* and *Hamilton* was humane and appropriate under the circumstances. Defendant Quinones was provided access to medical care, checked on daily by medical staff, fed the same meals as the crew, provided adequate shelter and clothing, permitted to use the restroom upon request, permitted to shower and brush his teeth regularly, permitted to move within a secure area along the 20-foot chain, and provided regular access to water.[13] *See United States v. Aguino-Ramos*, 406 F. Supp. 3d 1308, 1311 (S.D. Ala. 2019) (holding that similar circumstances during 32 days at sea were not sufficient to render defendants' statements involuntary after they arrived in port). Defendant Quinones also received pizza, chicken wings, and Gatorade on occasion and playing cards and dominos for entertainment on multiple occasions. Additionally, the watch standers sometimes played music for the detainees.

The undersigned has considered the testimony of Chief Swearer, Officer Saenz, Lieutenant Pearson, and Defendant Quinones regarding the conditions of detention, as well as the Detainee Log and a medical history log submitted into evidence without objection. The Court considered the interests of all witnesses in testifying and

---

[13] On the day Defendant Quinones did not have access to water, the *Mohawk* was forced to remain offshore during a resupply event due to the COVID-19 pandemic and could not produce potable drinking water.

observed their demeanor on the stand.  Officer Saenz provided extensive testimony regarding the detention conditions aboard the *Mohawk*.   As a watch stander and someone who is responsible for training new watch standers, he explained the watch stander duties, protocols, and procedures.  Officer Saenz candidly explained the Coast Guard procedures for providing showers, restroom breaks, water, food, entertainment, and medical care to detainees.   Officer Saenz's testimony regarding Defendant Quinones was consistent with the Detainee Log.  After observing his testimony and considering his interests, the Court finds Officer Saenz to be a credible witness.  He was calm, confident, and appeared forthright while testifying in court.  The testimony of Chief Swearer and Lieutenant Pearson regarding general protocols and procedures for detainees was also consistent with that of Officer Saenz.   After observing their testimony and considering their interests, the Court finds Chief Swearer and Lieutenant Pearson to be credible as well.

With respect to Defendant Quinones's medical care aboard the *Mohawk*, the medical staff did not provide any testimony.   However, the Court considered the testimony of Officer Saenz, Chief Swearer, and Defendant Quinones in this regard, as well as the medical log.  Defendant Quinones's medical complaints were promptly addressed by medical staff.   He was treated immediately for an allergic reaction. Thereafter, he did not report any medical issues or request any medical care that was denied.

Defendant Quinones testified that before his allergic reaction, he was provided medication for constipation, headaches, and depression.  Although he testified that the

medical staff did not administer additional medication for these conditions after his reaction, he also did not testify that he asked for any.  To the extent that Defendant Quinones testified he did not receive any medical treatment after his allergic reaction, this testimony is not credible.  The Detainee Log reflects that Defendant Quinones was seen by medical personnel at least once each day while aboard the *Mohawk*.  Chief Swearer and Officer Saenz also testified to this fact.  Moreover, the medical log reflects that on most days following his allergic reaction, he reported "no concerns" to the medical staff.  When needed, he was provided hydrocortisone cream and soluble fiber.

Similarly, although there was some testimony about medication he brought with him aboard the *Divino Nino Jesus*, the testimony did not establish that Defendant Quinones was denied necessary medication for any condition.  Accordingly, the Court finds that Defendant Quinones's detention and care while in Coast Guard custody were not inherently coercive so as to render Defendant Quinones's statements involuntary.  *See Aguino-Ramos*, 406 F. Supp. 3d at 1311 ("Therefore, under the totality of the circumstances, even with the 32 days at sea, Defendants' statements were voluntary and not the result of loss of the capacity for self-determination."); *see also United States v. Yunis*, 859 F.2d 953, 964 (D.C. Cir. 1988) (reversing suppression order for detainee held for questioning aboard a munitions ship; finding that uncomfortable conditions did not overcome defendant's will because defendant was alert and unimpaired at the time he waived his rights); *cf. United States v. Atkins*, No. 1:08-cr-010-MHS-RGV, 2008 WL 11431077, at *6 (N.D. Ga. May 6, 2008), *report and recommendation adopted,* No. 1:08-cr-10-MHS, 2008 WL 11432087 (N.D. Ga. June 19,

2008) (finding that defendant's recent gunshot wound did not render his waiver involuntary under the totality of circumstances because defendant was alert and oriented during questioning at the hospital).

### B. Transport

Defendant Quinones also argues that the conditions of his transport from Port Everglades to Pinellas County were so egregious as to render his statements to Agent Lima involuntary. Specifically, Defendant Quinones argues there is a dispute as to whether he was provided food and water during the approximately four-hour drive, as well as whether he was permitted to use the restroom. Additionally, Defendant Quinones asserts he was uncomfortably restrained on a crowded van for the duration of the trip.

In support of his contentions, Defendant Quinones filed a notice of additional authority from the Eleventh Circuit, citing *Bilal v. Geo Care, LLC*, ___ F.3d ____, No. 16-11722, 2020 WL 6864637 (11th Cir. Nov. 23, 2020). (Dkt. 137.) In *Bilal*, the Eleventh Circuit held that the transport conditions of a civilly committed offender violated his Fourteenth Amendment rights. The offender in *Bilal* was restrained during the transport using leg irons, waist chains, and black-box restraints. *Id.* at *6. He rode in a crowded van which travelled at excessive speeds. *Id.* Throughout the 600-mile trip, he was provided only one sandwich and denied restroom breaks. *Id.* On review of the dismissal of his claims under 42 U.S.C. § 1983, the Eleventh Circuit held that the offender stated a claim for violation of his Fourteenth Amendment rights only with respect to the denial of restroom breaks. *Id.* The Court found that although the

restraints, crowded van, limited food, and length of the trip may have been uncomfortable, these conditions did not amount to a violation of his constitutional rights. *Id.* at *6–7. However, because the offender was denied restroom breaks during the trip, he was forced to defecate in his clothing and remained in his own excrement for approximately 300 miles. *Id.* at *8. The Court found that this condition was not consistent with the offender's Fourteenth Amendment rights. *Id.* at *9.

Here, Agent Ramirez and Agent Lima testified that they understood that Defendants were provided food and a restroom break during the transport, but neither had any personal knowledge of these facts. Defendant Quinones testified that he was not provided with food until he arrived at the PanEx facility and that the van did not make any stops along the way. Defendant Quinones did not testify that he requested and was denied a restroom break, food, or water during transport. Upon arrival, at the PanEx facility, Defendants were given food, water, and access to a restroom. Defendant Quinones confirmed that he was provided a sandwich when he arrived at the PanEx facility, prior to his interview with Agent Lima. Defendant Quinones also testified when he asked for an additional sandwich, the agents candidly advised him they did not have any left. Further, the Detainee Log reflects that Defendant Quinones received three full meals the day before on the *Hamilton*. Therefore, regardless of whether Defendant Quinones was provided food during the drive to the PanEx facility, he was neither malnourished, soiled in his undergarments, nor unduly deprived of food prior to his single, one-hour interview with Agent Lima. *Compare United States v. Flores*, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *11 (N.D. Ga.

Sept. 27, 2007) (denying motion to suppress and rejecting defendant's assertion of coercion due to being handcuffed without food or water for three hours), *with Reck v. Pate*, 367 U.S. 433, 443 (1961) (holding confession was involuntary where defendant was physically ill, weakened by lack of food, and subjected to multiple days of questioning lasting for six or seven hours at a time).

Moreover, the van was air-conditioned and there is no evidence the drivers operated the van unsafely. Defendant Quinones did not state that he was interrogated during the trip. Even if the van did not make any rest stops along the way, the conditions of this transport are distinguishable from those at issue in *Bilal* because, most notably, Defendant Quinones was not forced to relieve himself in his own clothing. Accordingly, the Court finds that the conditions of the transport were not so inherently coercive as to render Defendant Quinones's statements involuntary. *United States v. Hernandez*, No. 1:13-cr-183-WSD, 2014 WL 869275, at *13 (N.D. Ga. Mar. 5, 2014) (adopting report and recommendation which noted that "the Defendant was subject to ordinary handcuffs and other restraints, as a prisoner being transported to court, was not something that would overbear the Defendant's free will").

### C. Personal Characteristics

Defendant Quinones argues that in light of his age, education, and lack of familiarity with American customs and legal processes, he was unable to knowingly and voluntarily waive his *Miranda* rights. Based upon the testimony and evidence presented and consideration of the totality of the circumstances, the undersigned finds that Defendant Quinones made a valid waiver of his rights.

During his testimony, Defendant Quinones responded to all questions with appropriate, articulate responses that indicated he understood the questions posed and the dialect of Spanish spoken by the interpreters.  Although he testified that he had limited education and understanding of the American legal system, these factors do not preclude a finding of a valid *Miranda* waiver.  *See Reyes v. Jones*, No. 17-80002-civ, 2018 WL 11216675, at *9 (S.D. Fla. Mar. 14, 2018), *report and recommendation adopted sub nom.*, No. 17-civ-80002, 2018 WL 11216674 (S.D. Fla. May 22, 2018) (concluding that "personal and cultural background is not currently a factor that federal courts consider when examining whether a *Miranda* waiver was made voluntarily"); *Castillo-Mejia v. Sec'y, Dep't of Corr.*, No. 8:07-cv-1585-T-27MAP, 2010 WL 2836744, at *4 (M.D. Fla. July 19, 2010) (finding, on a petition for habeas corpus, that the defendant's *Miranda* waiver was voluntary in the absence of police coercion, even though the defendant had limited education and an IQ of 65).

Defendant Quinones remained calm and polite during his interview with Agent Lima.  Agent Lima testified that if Defendant Quinones had stated that he was tired or physically uncomfortable during the interview, the interview would not have continued:

> Q: So what I'm asking is, you seem to have a particular recollection that he didn't make you aware of any concerns that he had medically or physically or anything like that, and I'm wondering if you don't recall his getting to that room, how you recall that particular lack of --
>
> A: Yeah.  What I can say is that I – had he voiced or shown any kind of discomfort or objection to, you know, because

> he was tired for whatever reason, you know, we would not
> have proceeded with the interview.

(Dkt. 125 at 24.)  Additionally, the Court observed Defendant Quinones's demeanor while testifying about the interview.  Defendant Quinones appeared fairly intelligent and he expressed himself well through a court interpreter.  He had a calm, serious, resolute demeanor in court.  He also appeared competent and capable of making a reasoned choice.  Moreover, Defendant Quinones appeared to be in fairly good health while in court.   The Court has considered Defendant Quinones's personal characteristics, education, and intelligence, the factual circumstances of the interview, and assessed the psychological impact on Defendant Quinones in reaching the conclusion that Defendant Quinones voluntarily, knowingly, and intelligently waived his rights.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.").

### D. Interview with Agent Lima

Defendant Quinones also argues that he did not knowingly and intelligently waive his rights because he did not understand what he was giving up when he signed the advice of rights form.  Agent Lima testified that, although he did not have an independent recollection of this interview, he employed the same procedure for each interview he conducted to ensure the advice of rights form was fully explained.  He testified that he reviewed each right individually, ensured the interviewee understood

each one, and "if there [were] any questions, they were addressed right then and there." (Dkt. 124 at 199.) Agent Lima has conducted numerous interviews in Spanish. In court, Agent Lima was confident, knowledgeable, and forthright. Having observed Agent Lima's in-court testimony and demeanor, as well as having considered his interests in testifying, the Court finds Agent Lima's testimony to be credible. *See generally United States v. Ramirez-Chilel*, 289 F.3d 744, 750 (11th Cir. 2002) (deferring to magistrate judge's credibility determination where magistrate judge took into account "the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand").

The Court notes that the advice of rights form admitted into evidence is written in Spanish, without an English translation.  In his Motion to Suppress, Defendant Quinones argues that he did not knowingly and intelligently waive his *Miranda* rights, but he does not contend that Agent Lima did not provide him *Miranda* warnings. (Dkt. 53.)  Further, Defendant Quinones does not argue that the advice of rights form itself, or its contents, were deficient in any manner.  After observing Agent Lima's in-court testimony, the Court credits his testimony regarding his procedure for advising interviewees of their *Miranda* rights and the advice of rights form.  The Court further credits Agent Lima's testimony that he employed that procedure to advise Defendant Quinones of his *Miranda* rights.

There is no dispute that Defendant Quinones was advised of his rights in Spanish. *See United States v. Guerrero*, 296 F. App'x 764, 767 (11th Cir. 2008) (affirming denial of motion to suppress where defendant was presented with a copy of the rights

waiver form in Spanish and his rights were explained to him Spanish); *United States v. Boon San Chong*, 829 F.2d 1572, 1575 (11th Cir. 1987) (affirming denial of motion to suppress despite a language barrier where the defendant was advised of his rights in English and Chinese).   To the extent Defendant Quinones testified that he did not understand Agent Lima's dialect, the Court does not find this testimony to be credible. Defendant Quinones testified at length about the conversation between himself and Agent Lima.   He explained that he believed Agent Lima could help him if he decided to cooperate, that he was afraid of what information the investigators may have obtained from his codefendants, and that he understood he had a choice in whether or not to sign the advice of rights form.   This testimony demonstrates that Defendant Quinones understood Agent Lima's dialect and could communicate with him.

Similarly, the Court discredits Defendant Quinones's testimony wherein he stated that he signed the forms solely at the direction of Agent Lima and did not understand the nature of his actions.   Defendant Quinones first testified that when he signed the forms, he was merely following Agent Lima's instructions.   Later in his testimony, Defendant Quinones explained that he did not ask any questions about the forms because he believed that he would fare better if he cooperated.   (Dkt. 125 at 90–91.)   When asked directly whether he believed he had a choice whether to sign the forms, he unequivocally responded "yes."   (*Id.*)   Additionally, Defendant Quinones stated on multiple occasions that he believed he would benefit from cooperating and he was concerned that law enforcement "already knew everything."   (Dkt. 125 at 86, 89, 91.)   To the extent Defendant Quinones's testimony conflicts with that of Agent

Lima about the review of the advice of rights form, the Court finds Defendant Quinones's testimony to be inconsistent and not credible.  As such, the Court finds that Defendant Quinones made a knowing, reasoned choice, free from coercion or influence, to sign the advice of rights form and provide a statement to Agent Lima.

### E. Statements by Agent Lima

Defendant Quinones argues that Agent Lima's kindness and other statements during the interview amounted to coercion.  Based upon the testimony and evidence, this contention does not warrant suppression.

Where, as here, *Miranda* warnings are given and the accused makes an uncoerced statement, "[t]he prosecution must make the additional showing that the accused understood these rights."  *Berghuis*, 560 U.S. at 384.  This is because "[a] statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege."  *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citing *Miranda*, 384 U.S. at 444).

In *United States v. Beale*, the defendant signed a written waiver of his *Miranda* rights after the officers "told him that it would not hurt him."  921 F.2d 1412, 1434 (11th Cir. 1991).  Noting that *Miranda* warnings "must not be misleading," the Eleventh Circuit found that the officers misled the defendant "concerning the consequences of relinquishing his right to remain silent" by "contradict[ing] the *Miranda* warning that a defendant's statements can be used against the defendant in court."  *Id.* at 1435.

Additionally, in *Hart v. Attorney General of State of Florida*, the defendant waived his rights but asked about the "pros and cons of having an attorney."  323 F.3d 884, 888 (11th Cir. 2003).  The officer stated that an attorney would tell the defendant not to answer questions, even though "honesty wouldn't hurt him."  *Id.* at 888–89.  Citing to *Beale*, the Eleventh Circuit found that because of the officer's statements "contradicting the *Miranda* warnings," the defendant "did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it."  *Hart*, 323 F.3d at 895 (citing *Beale*, 921 F.2d at 1435).

In *United States v. Lall*, after reading the defendant his *Miranda* warnings, but before interrogating him, the officer told the defendant "he was not going to pursue any charges against him."  607 F.3d 1277, 1283 (11th Cir. 2010).  Citing to *Hart*, the Eleventh Circuit found that the officer's "representation contradicted the *Miranda* warnings previously given" and thus the defendant did not truly understand the rights he was waiving.  *Lall*, 607 F.3d at 1283–84 (citing *Hart*, 323 F.3d at 895).

Collectively, these cases illustrate that a waiver is not knowing and intelligent where the *Miranda* rights are contradicted by an interrogating officer.  Officers may not "lie to the suspect about his *Miranda* rights if he indicates that he does not understand them and asks for clarification" either while being read his *Miranda* rights or during an interrogation.  *Hart*, 323 F.3d at 895 n.21.

However, in *United States v. Quinn*, the Eleventh Circuit held that discussions of a potential sentence or advising a witness of the consequences he may face does not

warrant suppression. 123 F.3d 1415 (11th Cir. 1997). In *Quinn*, the defendant argued the interviewing agent told him he was facing a 40-year sentence but may benefit if he cooperated. The Eleventh Circuit noted that statements from an interviewing agent about realistic penalties are insufficient to preclude a free choice and concluded that the agent's advice on the potential consequences of obtaining counsel were not coercive. *Id.* at 1424; *see also United States v. Shaw*, No. 2:16-cr-65-FTM-UAMRM, 2016 WL 6163599, at *7 (M.D. Fla. Oct. 24, 2016) ("[A] police officer's misrepresentation of facts is not enough to render a suspect's confession involuntary, nor will such misrepresentation undermine the waiver of a defendant's *Miranda* rights."); *United States v. Godinez*, No. 03-20566-cr, 2003 WL 27385603, at *8 (S.D. Fla. Oct. 24, 2003), *report and recommendation adopted sub nom. United States v. Walden*, No. 03-20566-cr, 2004 WL 7338544 (S.D. Fla. Jan. 26, 2004) ("[W]here the defendant has been accurately advised of the required *Miranda* warnings, in the absence of other coercive factors, the fact that an accused is accurately advised of the advantages of cooperation, and encouraged to do so, does not per se render a waiver of rights or subsequent statement involuntary.").

Here, Agent Lima did not make any promises of leniency, did not provide any false information, and did not make any misrepresentations about the nature of Defendant Quinones's *Miranda* rights. Although Defendant Quinones testified that Agent Lima told him about other, unrelated defendants who had received sentences of incarceration of 30 years or more, he did not indicate that Agent Lima stated he was facing a similar sentence. *United States v. Waggerby*, No. 2:19-cr-4-FTM-60NPM-1,

2020 WL 1027644, at *3 (M.D. Fla. Mar. 3, 2020) (denying motion to suppress upon finding, in part, that the record demonstrated that although detectives referenced the death penalty during interrogation, the detectives did not threaten the accused with that possibility or promise any leniency in exchange for cooperation).   Defendant Quinones did not ask any questions about his rights before or after waiving them, and he does not allege that Agent Lima provided him with any false information about the nature of those rights.   The fact that Defendant Quinones believed that he may benefit from cooperating with Agent Lima is not tantamount to coercion.   *See United States v. Hipp*, 644 F. App'x 943, 947 (11th Cir. 2016) ("[A] general statement that cooperation may be beneficial to an accused, with no promise of leniency, does not amount to an illegal inducement."); *Godinez*, 2003 WL 27385603, at *8 (finding that the advice of rights was not undermined by the agent's statement that the defendant "would be able to help himself by making a statement").

Indeed, Agent Lima discouraged Defendant Quinones from making a statement that he perceived was untrue.   When Defendant Quinones told Agent Lima a version of events that Agent Lima found not to be credible, he advised Defendant Quinones to tell the truth.   *See Hipp*, 644 F. App'x at 947 ("A mere admonition to the accused to tell the truth does not render a statement involuntary."); *United States v. Byrd*, No. 1:16-cr-315-02-TWT-AJB, 2017 WL 3821696, at *7 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted,* No. 1:16-cr-315-2-TWT, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017) (finding that an officer "beseeching" a defendant to tell the truth does not render a statement involuntary).   Accordingly, this case is distinguishable from *Beale*,

*Hart*, and *Lall*.  *See Beale*, 921 F.2d at 1434 (officers told the defendant that making a statement "would not hurt him"); *Hart*, 323 F.3d at 888–89 (officers told the defendant that "honesty wouldn't hurt him"); and *Lall*, 607 F.3d at 1283 (officers told the defendant they would not pursue charges against him).  The Court finds that Agent Lima's statements were not coercive and did not contradict or undermine the explanation of Defendant Quinones's rights under *Miranda*.

## CONCLUSION

In sum, the undersigned has considered the totality of the circumstances concerning the interview with Agent Lima, including the details of the interview itself and Defendant Quinones's personal characteristics.  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010).  The Court has evaluated whether the agents "overreached" and considered factors such as Defendant Quinones's education, intelligence, advice of his rights, the length and nature of his detention, his transport to the PanEx facility, the nature of the questioning, and the provision of basic necessities.  *Id.*

Upon consideration of the testimony and evidence, and having evaluated the interests of all witnesses and observed their demeanor while testifying, the undersigned finds that the Government established by a preponderance of the evidence that Defendant Quinones's decision to waive his *Miranda* rights was a "free and deliberate choice rather than [the product of] intimidation, coercion, or deception."  *Moran*, 475 U.S. at 421.  The undersigned further finds that Defendant Quinones made this choice

"with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Accordingly, it is **RECOMMENDED** that Defendant Arboleda Quinones's Motion to Suppress Statements (Dkt. 53) be **DENIED**.

**IT IS SO REPORTED** in Tampa, Florida, on December 22, 2020.

JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Copies furnished to:
The Honorable Charlene E. Honeywell
Counsel of Record