UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.     CASE NO. 8:20-cr-138-CEH-JSS

DILSON DANIEL ARBOLEDA QUINONES

## UNITED STATES' OPPOSITION TO DEFENDANT'S PRETRIAL MOTION (DKT. 167)

The United States opposes defendant Dilson Daniel Arboleda Quinones's Untimely Pretrial Motion at Dkt. 167[1]. In support of its position, the United States submits the following Memorandum of Law.

### I. Procedural Background

On March 19, 2020, a federal grand jury returned an indictment charging Mr. Quinones and his two co-defendants with conspiring to distribute, and possessing with the intent to distribute, five kilograms or more of a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C.§ 960 (b)(1)(ii), 46 U.S.C. §§ 70503(a), 70506(a) and (b), and 18 U.S.C.§ 2. Dkt. 1.

On June 15, 2020, Mr. Quinones filed a motion to suppress "any and all statements he made to law enforcement on and after March 11, 2020." The government responded in opposition on July 20, 2020. Dkt. 67. An evidentiary

---

[1] The United States opposes suppression of Mr. Quinones's statements and release from custody, generally, but responds here only to those additional arguments permitted by this Court in its ruling at Dkt. 201. The United States has previously addressed Mr. Quinones's other suppression arguments at Dkt. 67 and 171.

hearing was held on October 13-15. After the motions hearing, Mr. Quinones moved for leave to file an untimely pretrial motion ("Motion for Leave") raising new arguments for suppression and moving for release from custody. Dkt. 134

On January 22, 2021, this Court granted in part Mr. Quinones's Motion for Leave, permitting him to move to suppress his statement based on the additional allegation that the Government did not comply with Federal Rule of Criminal Procedure 5, but not permitting him to move for release or suppression on other grounds. Dkt. 166. The Untimely Pretrial Motion was docketed at Docket 167. On February 5, 2021, the government filed a response in opposition to the permitted portion of the Untimely Pretrial Motion. Dkt. 171.

On January 27, 2021, Mr. Quinones moved the court to reconsider its decision to deny in part his Motion for Leave. This Court granted the motion to reconsider. Dkt. 201. On reconsideration, this Court permitted Mr. Quinones to move to suppress his statements on two additional grounds:(1) arguments seeking suppression of Mr. Quinones's statements pursuant to the Suspension Clause and Eighth Amendment; and (2) arguments seeking to suppress the State Department certification under the Fifth Amendment. *Id.*

## II. Factual Background

The charges in this case arose out of a March 10-11, 2020 interdiction by the U.S. Coast Guard Cutter MOHAWK, approximately 87 nautical miles south of Jicarita Island, Panama, in international waters. Mr. Quinones, a Colombian national, was on board a small, open hull "go fast" vessel (GFV), with two other

men (his co-defendants). In response to Coast Guard questioning, none of the men claimed to be the master or person in charge, and all refused to make a claim of nationality for the vessel. The Coast Guard boarding team observed fresh paint near the front of the vessel and a raised portion of the deck, which was consistent with a false deck. After being authorized to treat the vessel as stateless and conduct a search, the boarding team bored holes into the raised portion of the deck. A white powdery substance was observed on drill bit into the space and tested positive for cocaine. About 430 kilograms of cocaine were found under the false decking in the vessel.

**A. Right-of-approach questioning**

During the evidentiary hearing, Coast Guard Chief Petty Officer Jeremy Swearer (Chief Swearer) testified that he was the boarding officer during the subject interdiction. Transcript Vol I of III of 10-13-2020 at p. 34. He described the general procedures the Coast Guard uses upon approaching a vessel of interest, such as a GFV. Transcript Vol I of III of 10-13-2020 at p. 34. On approaching a GFV, the boarding team members typically come up to the boat, identify themselves, and tell the crew to muster in a particular area for safety. *Id.* at p. 41. Then, they ask questions from the Alpha and Victor Report to determine the master or person in charge, if any, last port of call, and next port of call. *Id* at p.41-42*; See also* Government Exhibit 6.

In this case, the questions were asked with the Coast Guard's over-the-horizon small boat (OTH) pulled alongside the GFV. The Coast Guard did not go on board the GFV while asking these questions. *Id.* at p. 45. They did not board the GFV or

place the crew in handcuffs until after they completed the right-of-approach questioning, passed the information back to the cutter, and received authorization to conduct a law enforcement boarding. *Id.* at p. 46. The Coast Guard boarding team did not ask any more questions or interrogate the crew in any way once they had collected responses to the right-of-approach and right-of-visit questions.

      Coast Guard Petty Officer Luis A. Saenz, (Petty Officer Saenz), was the interpreter on the boarding team and testified about the right-of-approach questioning. *Id.* at p 145. Petty Officer Saenz did not recall exactly what was said in response to the right-of-approach questioning but recalled that none of the men claimed to be the master or person in charge, and they each refused to claim any nationality for the vessel. *Id.* at p. 151-2. Petty Officer Saenz recalled they had said something to the effect that no one was in charge and they all took turns driving the boat, and that they didn't want to make a claim of nationality. *Id.* at p. 151, 153. In response to the right-of-approach questioning, the men got into what Petty Officer Saenz called "their story," *Id.* at p. 189. Petty Officer Saenz testified that the statements included, "he was taken from his place of work off to an island somewhere, stayed there for an extended period of time…then told to get on this boat, steer on a certain course for a certain amount of miles and…there will be another vessel out there to meet with them, and they'll be told what to do from there." *Id*. at p. 187. Petty Officer Saenz recalled that Mr. Quinones was "chiming in" or "saying words," but the primary speaker was another defendant. *Id*. at p. 187,

189-190. He could not recall the specific words Mr. Quinones said, but his impression was that they reinforced the statements made by the other defendant. *Id.*

B. Detention at sea

While detained aboard the Coast Guard Cutter MOHAWK, Mr. Quinones and his co-defendants were housed on the top deck of the cutter under a self-supporting all-weather tent, provided with two blankets and a plastic platform cot, provided with Tyvek suits and sandals, and provided with new suits or sandals when the ones they were wearing became unserviceable. Additionally, the three men were provided three meals a day consisting of the same food as the Coast Guard crew. They were visited daily by the Coast Guard medical service provider, who was the same independent duty healthcare worker who cared for the members of the Coast Guard crew. The men were regularly given opportunities to shower, brush their teeth, and use the restroom.

Occasionally, the men were provided with music or movies for entertainment and offered playing cards and dominos. They were secured during their detention using a shackle on one ankle which was attached to a chain running the length of the detainee area. This device was necessary to ensure the detainees would not have unrestricted access to the interior spaces of the cutter.

The conditions of the detention were described in detail during the evidentiary hearing in this case are also laid out in detail in the Magistrate Judge's Report and Recommendations regarding Mr. Quinones's motion to suppress, Dkt. 150, and in the Government's responses at Dkts. 67 and 171.

### III. Analysis

**A. Mr. Quinones cites no authority requiring this Court to suppress his statement based on an alleged violation of the Suspension Clause of the U.S. Constitution.**

"The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. Art. I, § 9, cl. 2. "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484, (1973). Thus, the remedy for unconstitutional suspension of the privilege is to permit the prisoner to challenge his detention through a petition for a writ of habeas corpus. *Boumediene v. Bush*, 553 U.S. 723, 798 (2008) (holding that a statue that expressly denied federal courts jurisdiction to hear habeas petitions of enemy combatants detained at Guantanamo Bay unconstitutionally suspended the writ in violation of Art I, § 9, cl. 2).

This Court has denied Mr. Quinones' Motion for Leave "to the extent Defendant Quinones's arguments arising under the Suspension Clause and Eighth Amendments are, in effect, a motion for release," permitting only consideration of whether these arguments support suppression of Mr. Quinones's statement. Dkt. 201 at p. 9. However, defendant cites no authority supporting the premise that suppression of statements is a remedy for suspension clause violation. It is not necessary for this Court to analyze whether and when MDLEA defendants may petition for writs of habeas corpus to decide whether to suppress Mr. Quinones's

statements. Mr. Quinones has not petitioned for a writ of habeas corpus, and, except for the arguments advanced in his proposed Untimely Pretrial Motion (Dkt. 167), has not challenged his detention, including at initial appearance, when he reserved on the issue of bond. See Dkt. 20.

In support of his argument, Mr. Quinones relies on the concurring opinion of Chief Judge Rosenbaum in *Cabezas-Montano*. 949 F. 3d 567 at 616-17 (C. J. Rosenbaum, concurring). In that opinion, Chief Judge Rosenbaum posits that MDLEA defendants are entitled to petition for a writ of habeas corpus, but does not prescribe or adopt a test for when that right would attach. Neither this concurring opinion nor any other authority cited by defendant states that suppression of a statement is a remedy for unconstitutional suspension of the privilege to petition for a writ of habeas corpus. Likewise, Mr. Quinones has also cited no authority that requires a detainee to have the practical ability to petition for such a writ immediately upon detention. In *Boumediene,* the Supreme Court explained that "[i]n cases involving foreign citizens detained abroad by the Executive, it likely would be both an impractical and unprecedented extension of judicial power to assume that habeas corpus would be available at the moment the prisoner is taken into custody." *Boumediene,* 553 U.S. at 793. Instead the expectation was that when habeas corpus jurisdiction applied, proper deference could be "accorded to reasonable procedures for screening and initial detention under lawful and proper conditions of confinement and treatment for a reasonable period of time." *Id.*

The Court is not now deciding whether Mr. Quinones is entitled to petition for a writ of habeas corpus, or whether he is entitled to release. Instead, this Court has limited the inquiry to whether Mr. Quinones's statements should be suppressed. Dkt. 201 at p. 9. This Court is already considering the effect of the length and conditions of detention on the admissibility of Mr. Quinones's statements in the context of Mr. Quinones's motion to suppress his statement due to alleged involuntariness or violation of Federal Rule of Criminal Procedure 5. These issues have already been fully briefed. *See* Dkts. 53, 67, 167, 171. As the Eleventh Circuit wrote in *Cabezas-Montano,* "the correct analytical framework for [the defendant's] delay-in-presentment challenge is under Rule 5(a) and the *Purvis* factors. . . ." *Cabezas-Montano,* 949 F.3d at 594 (rejecting Fourth Amendment challenge to the length and manner of defendant's detention). It is in this context, and that of *Miranda,* that this Court should (and has) addressed Mr. Quinones's claims regarding the effect of the length and conditions of his detention on the admissibility of his statement.

**B. Mr. Quinones cites no authority requiring this Court to suppress his statement based on an alleged violation of the Eighth Amendment to the U.S. Constitution.**

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishment." U.S. Const. amend. VIII. Claims of Eighth Amendment cruel and unusual punishment are, strictly speaking, limited to post-conviction prisoners. *Jackson v. West,* 787 F.3d 1345, 1352 (11th Cir. 2015) (explaining that because pretrial detainees are not being punished, the Eighth Amendment prohibitions against cruel

and unusual punishment do not apply). A pretrial detainee's claims regarding the conditions of their detention are typically analyzed under the Due Process protections of the Fifth or Fourteenth Amendment, as applicable, and are typically brought as civil actions, for example, under 42 U.S.C. §1981. *See, e.g., Bell v. Wolfish*, 441 U.S. 520 (1979).

Mr. Quinones has cited no authority for suppression of his statement based on an alleged Eighth Amendment (or Due Process) Violation. In this case, Mr. Quinones has already laid out his position regarding the effect of the length and conditions of his detention on the admissibility of his statements. Further, this Court has limited the inquiry to whether Mr. Quinones's statements should be suppressed, not whether he is entitled to release from custody. Dkt. 201 at p. 9.

This Court has already permitted consideration of the length and conditions of detention in the context of Mr. Quinones's motion to suppress his statement due to alleged involuntariness or violation of Federal Rule of Criminal Procedure 5. These issues have already been fully briefed (*See* Dkts. 53, 67, 167, 171) and provide the correct analytical framework for Mr. Quinones's motion to suppress his statements.

- **C. The Coast Guard was not required to provide *Miranda* warnings prior to right-of-approach questioning; therefore, neither Mr. Quinones's statements in response to these questions nor State Department certificates should be suppressed.**

Before discussing the non-custodial and non-incriminating nature of right-of-approach questioning, it's helpful to frame the impact of responses, if any, to right-of-visit questioning on the state department certificates in this case, the impact of the

9

state department certificates on the jurisdiction determination, and the impact of the state department certificates at trial. There is a State Department certificate which was provided in discovery in this case and admitted as an exhibit during the October 13-15 motions hearing on the defendants' motion to suppress (Dkt. 119-18). This certificate documented (and, under 46 U.S.C. 70502(d)(2), would serve as conclusive proof of) the response of the nations of Colombia and Costa Rica to inquiries about the subject vessel's nationality. As set out in the certificate, the inquiry to Colombia was made pursuant to operational procedures between the government of Colombia and that of the United States due to a statement that the last port of call of the vessel was Colombia (despite there being no legal claim of nationality). Dkt. 119-18. The inquiry to Costa Rica was made due to the appearance of the vessel and had nothing to do with statements of defendants. *Id.* The response from Colombia is potentially based on a defendant's statement about the last port of call, but such statement was not custodial or incriminating (as discussed below).

Also, the United States is not utilizing the certificate to establish jurisdiction.[2] Jurisdiction in this case is premised on the defendants' failure to claim a nationality for the vessel in one of the ways permitted by 46 U.S.C. § 70502(e). *See Cabezas-Montano*, 949 F.3d at 590 ("It also is of no matter that the Coast Guard takes the last port of call as the nationality of the vessel and contacts that corresponding

---

[2] The defendants' motion to dismiss for lack of jurisdiction is still pending before the court. The issue has been fully briefed at Dkts. 48, 50, 52, 56, 66, 68, 144, 151, 152, 153, 160.

government when no claim is made. Whatever the foreign government's response (or non-response), the Coast Guard's taking of that additional step does not void a statelessness finding under §§ 70502(c)(1)(A) and 70502(d)(1)(B)." Finally, because state department certifications are only relevant to the determination of subject matter jurisdiction and not to elements of the offense, they are not admitted at trial in general, much less in this case. *See* Dkt. 127 at p. 151, 153, *United States v. Tinoco*, 304 F.3d 1088, 1108 (11th Cir. 2002).

1. **Coast Guard questioning in this case was non-custodial, and therefore did not require Miranda warnings.**

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const.amend. V. In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of the right to remain silent and of the right to the assistance of counsel prior to any interrogation. Whether a person is "in custody" and entitled to *Miranda* warnings is a mixed question of law and fact. The issue is whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." *United States v. Brown,* 441 F.3d 1330, 1347 (11th Cir. 2006); *United States v. Street,* 472 F.3d 1298, 1310 (11th Cir. 2006) (holding that *Miranda* is required only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest).

The Eleventh Circuit has applied this analysis to maritime cases in the past. In *Rioseco,* 845 F. 2d 299, 302-03 (11th Cir. 1988), the court deemed that a master of a vessel was not in custody during an initial Coast Guard boarding, even though the Coast Guard personnel were armed and vessel personnel were gathered in one place during the boarding. *Id.* ("This circuit has long recognized that the Coast Guard's routine stop, boarding and inspection of an American vessel on the high seas does not normally rise to the level of custodial detention thus requiring *Miranda* warnings."). *See also United States v. Napa Moreira*, 810 F. App'x 702, 706 (11th Cir.) (Court's prior precedent in *Rioseco* foreclosed Fifth Amendment facial challenge to MDLEA); *United States v. Ortega*, No. 12-20580-CR, 2012 WL 12894242, at *4 (S.D. Fla. Dec. 3, 2012) (interdiction at the border was not a custodial situation, even though law enforcement approached subject vessel with a show of force; these actions were commensurate with a nighttime vessel interdiction with reasonable suspicion of alien smuggling, and the agents only asked routine questions commensurate with an interdiction at the border); *cf. United States v. Portocarrero-Reina*, No. 8:05-CR-365-T-27TBM, 2006 WL 1460277, at *5 (M.D. Fla. May 23, 2006) (questioning was custodial when the defendants were confined to a small space for four days with armed escorts).

In this case the Coast Guard approached the GFV navigated by Mr. Quinones and his two co-defendants, directed the vessel to stop, and came alongside the vessel without using any force to compel the GFV and its crew to stop. They asked the crew to muster for safety, then proceeded with right-of-approach questions while

they were in their own vessel and the three men remained aboard the GFV. The questions asked included requesting the master or person in charge to identify himself, and asking the men to make a claim of nationality. The Coast Guard did not board the vessel, nor handcuff the defendants, until *after* this questioning was completed, and they had received authorization to board the vessel. Like in *Rioseco,* "[t]he mere fact that Coast Guard officers were armed and that *the [boarded vessel's ]*personnel were gathered in one specific area of the boat during the routine search of the boat subsequent to boarding could not lead a reasonable man to believe that he was in custody." *Rioseco*, 845 F.2d at 303.

2. **Questions by the Coast Guard called for administrative rather than incriminating information, therefore *Miranda* warnings were not required.**

Under international law, a warship may approach any vessel in international waters to verify its nationality. *Marianna Flora*, 24 U.S. 1, See also Anna van Zwanenberg, *Interference with Ships on the High Seas*, 10 INT'L & COMP. L.Q. 785 (1961). As a matter of practice, the Coast Guard has developed a series of standard right of approach questions including inquiries about the nationality of the vessel and crew, number of persons on board, type of catch or cargo, vessel's last port of call, the vessel's next port of call, and the purpose of the vessel's voyage.

These queries are ministerial in nature and do not constitute custodial interrogation. *Rioseco*, 845 F.2d at 302-03 (finding no evidence in the record that the USCG deliberately used the routine pre-boarding questioning process to obtain

information prejudicial to defendant rather than for the usual routine purposes). In addition to the long-held recognition that Coast Guard routine stops, boarding, and inspections are not custodial detention, the Eleventh Circuit has also recognized a "booking exception," which provides that an officer's request for " 'routine' information for booking purposes is not an interrogation under *Miranda,* even though that information turns out to be incriminating." *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991), citing *United States v. Sims,* 719 F.2d 375, 378-79 (11th Cir 1983).

In this case, the information elicited to determine the nationality of the vessel is *not* incriminating because it has nothing to do with proving the substantive violation of the MDLEA—so it does not implicate the Fifth Amendment. *See*, e.g.,*Cabezas-Montano*, 949 F.3d 567 at 619 (C .J. Rosenbaum concurring); *United States v. Tinoco*, 304 F.3d 1088, 1108 (11th Cir. 2002) (Congress can properly define jurisdiction and venue as issues of the Court's subject -matter jurisdiction rather than elements of the offense).

Because the Coast Guard was not required to provide *Miranda* warnings prior to asking routine, administrative boarding questions from their own vessel to the defendants who were located on another vessel, any statements made by the defendants in response to those questions are admissible at trial.

## IV. Conclusion

Wherefore, the United States respectfully requests that this Court deny all relief sought in Mr. Quinones' Untimely Pretrial Motion.

                                                Respectfully submitted,

                                                KARIN HOPPMANN
                                                Acting United States Attorney

                                  By:   */s/ Tereza Zambrano Ohley*
                                              Tereza Zambrano Ohley
                                              Special Assistant United States Attorney
                                              Florida Bar No. 0060407
                                              400 N. Tampa Street, Suite 3200
                                              Tampa, Florida 33602
                                              Telephone: (813) 274-6000
                                              Facsimile: (813) 274-6103
                                              Email: Tereza.Ohley@usdoj.gov

U.S. v. Arboleda Quinones         Case No. 8:20-cr-138-CEH-JSS

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Counsel of Record

                                    */s/ Tereza Zambrano Ohley*
                                    Tereza Zambrano Ohley
                                    Special Assistant United States Attorney
                                    Florida Bar No. 0060407
                                    400 N. Tampa Street, Suite 3200
                                    Tampa, Florida 33602
                                    Telephone: (813) 274-6000
                                    Facsimile: (813) 274-6103
                                    Email: Tereza.Ohley@usdoj.gov